Succession of Rabasse.

No. 12,928.

SUCCESSION OF DR. EUGENE RABASSE.    OPPOSITION OF HEIRS TO FINAL
ACCOUNT.

SYLLABUS.

(1)  A charge made against a succession representative of an amount which he
contracted to pay a guaranty company for becoming surety upon his bond,
cannot be sustained in the absence of an express provision of law authorizing
same.

(2)  By the terms of Act 104 of 1896, an auctioneer is entitled to demand and
receive as a compensation for his services on all sales of succession prop-
erty made by him, a commission of not more than two *per cent.* on the first
ten thousand dollars of proceeds, and one *per centum* of the excess.

(3)  Jurisprudence has settled the rule and consecrated it, that the *quantum*
of attorney's fees in any case where the services have been performed in
the presence of the court which is called upon to decide the question, is a
matter of law rather than one of fact, and that it will value same as its
opinion and sound discretion dictate, rather than base its judgment upon
the opinions of witnesses.

ON APPEAL from the Civil District Court for the Parish of Or-
leans.  *Ellis, J.*

*Henry Chiapella* for Testamentary Executor, Appellee.

*E. J. Meral, J. Numa Augustin* and *Charles F. Claiborne* for Mes-
dames Pincaut and Maissons, Opponents, Appellants.

*Solomon Wolff* and *J. F. Pierson,* (E. Howard McCaleb of Counsel)
for Henry Chiapella, Individually, Appellee.

*E. Howard McCaleb, Felix J. Dreyfous* and *Solomon Wolff* for
David Danziger, Auctioneer, Appellee.

Argued and submitted December 19, 1898.
Opinion handed down January 23, 1899.
Judgment amended and rehearing refused March 7, 1899.

The opinion of the court was delivered by

Succession of Rabasse.

WATKINS, J.   The collateral heirs of the deceased, opposed the final account filed by the testamentary executor on several grounds, and, on the trial of the oppositions, the district judge approved and homologated same, after having modified it in a few minor particulars; and from that judgment, the opponents have appealed—the executor having acquiesced in the amendments and modifications made.

As many of the items of the oppositions have been withdrawn, and only a few of them are now insisted upon, attention will be directed to those only.

The approximate amount of the estimated value of the estate as it is exhibited by the original inventory, is one hundred and fourteen thousand dollars ($114,000), and it is upon that basis that the discussion must primarily proceed, notwithstanding the opponent's counsel contend that the appraisements were excessive and inflated, and in consequence thereof the amount charged for attorney's fees is likewise excessive, and ought to be greatly reduced.

Counsel say in their brief, "if the items of the account are to remain, then we have the following charges of administration, viz.:

"Commission, Executor ........................................$ 2,855.40
Charbonnet, Notary ....................................    550.00
Appraisers ..... ........................................    325.00
Clerk Terrebonne .......................................     50.00
DePoorter, Attorney ....................................    650.00
Auctioneer .... .......................................  2,129.37
Chretien & Suthon .....................................    200.00
Buisson, Attorney, absent heirs .......................    350.00
Commission on rents ...................................    170.00
Costs of Court ........................................    200.00
Stenographer .. .......................................    400.00
Experts ..... .........................................    275.00
Chiapella's briefs ....................................    272.00
Attorney for Succession ............................... 11,421.63
Charbonnet, Notary ....................................    339.00
Keepers of Seals ......................................    100.00
Appraisers .... .......................................     50.00
Surety's Commission ...................................  1,200.00

    Total ............. ...............................$21,527.40

"Equal to almost one-third of the total value of the property abandoned to the heirs."

The following is the list of items which are opposed, and with regard to which we are called upon to pass judgment, viz.:

1. The Executor's commission.

2. A charge he made against the succession, which he agreed to pay to a third party for procuring him a bond or for signing his bond.

3. The auctioneer's commission and h's charges for advertisement.

4 Penalties on taxes paid by the Executor, and

5. Fees charged by the attorney of the succession.

We will take them up and dispose of them *seriatim,* in the order stated above.

### I.

The item of executor's commissions of two and one-half *per cent* on the amount of the inventory, is disposed of by the following statement in the principal brief of opponent's counsel, viz.:

"We have to submit to the executor's commission of two and one-half *per cent* upon the amount of the inventories, one hundred and fourteen thousand dollars, say two thousand, eight hundred and fifty-five dollars."

This confession closes the controversy, in so far as that question is concerned, and leaves the account *in statu quo, pro hac.*

### II.

With regard to the commissions of two and one-half *per cent* which the auctioneer charged, counsel for the opponents make the statement, that same was made upon each separate adjudication, as a distinct and separate sale, and that the judge *a quo* allowed them—only reducing the rate from two and one-half to two *per cent.*

We extract the following from the brief of opponent's counsel, viz.:

"The commission allowed by the lower court in bills A and C, the sales being below ten thousand dollars, is correctly fixed at two *per cent.* But as regards bill B the sales aggregating twenty-five· thousand and thirty dollars, should be reduced as follows:

Succession of Rabasse.

| | |
|---|---|
| Two per cent. on $10,000 .......................... | 200.00 |
| One per cent on $15,030 .......................... | 150.30 |
| | 350.00 |
| The auctioneer charged .......................... | 625.75 |
| An overcharge of .......................... | 275.45." |

And the following is an extract from the opinion of the judge *a quo* on this subject, viz.:

"The heirs oppose the auctioneer's commission. Act 104 of 1896, provides the tariff of charges at two *per cent* on the first ten thousand dollars, and one *per cent* on the excess. There is much in the rule settled in Van Hogan Succn., 42 An. 620, to support the claims of the auctioneer for two and one-half *per cent,* as virtually consented to by some of the heirs, and acquiesced in by all, in the matter of some of the sales accounted for in a former account.

"But, as there was no express agreement by all, I fix the rate established by the act of 1894.

"I think the auctioneer is entitled to two *per cent.* on each adjudication made by him, none of them reaching ten thousand dollars.

"There were some twenty properties sold, situated, some in this city, but most of them in the country. There were about twenty separate adjudications to as many different purchasers; almost to each purchaser, there was a separate adjudication, a separate act of sale, a separate price paid, and for each adjudication the delay for a separate title examination.

"All the properties were not sold on the same day, or at the same time.

"There was *all* the trouble of obtaining exact information *as to each property,* and its derivative title.

"They were *separate* sales.

"That some of them may have been grouped under one advertisement, with a separate item of description, as to each, does not make *of all the adjudications one adjudication.*

"As none of them exceeded ten thousand dollars, the law gives the auctioneer his two *per cent* on *each* adjudication.

"Suppose two-thirds of the appraised value was required to effect the sale, and such was and is the law; and suppose that some of the properties brought more than two-thirds, and some of them less than

38

two-thirds of the appraised value, and that combining all the prices *an average of two-thirds* had been realized, it seems to me, that there would be a legal adjudication of *such properties* only as brought the essential two-thirds, and that there would be *no sale* of such as failed to bring two-thirds of the appraised value. If this be true, then it must also be true that the auctioneer's power and *duties attach separately* to each property, that he deals with each separately, and that, therefore, his commission is to be calculated *separately,* on the price brought by each adjudication."

It thus appears, that the only controversy is with regard to bill B, and that the only amount that is alleged to have been overcharged is two hundred and seventy-five dollars and forty-five cents.

It further appears that the auctioneer made sales aggregating in proceeds the sum of thirty-six thousand, two hundred and eighty dollars, but having adjudicated to one of the legatees an amount equal to eleven thousand, two hundred dollars, a commission of two and one-half *per cent.* was charged on the residue of twenty-five thousand and thirty dollars, equal to six hundred and twenty-five dollars and seventy-five cents.

The district judge only allowed two *per cent,* and thus reduced the commission to the sum of five hundred dollars and sixty cents, and opponents contend that it should have been reduced to three hundred and fifty dollars and thirty cents—a difference of one hundred and fifty dollars and thirty cents in addition.

The contention on the part of the auctioneer is, that he made eighteen separate and distinct sales, for each of which he is entitled to charge a separate commission.

The law which governs the auctioneer's commission is as follows, viz.:

"No auctioneer shall demand or receive a higher compensation for his services on all sales of real estate than a commission of two and one-half per cent. on the amount of any sale, public or private, made by him; and on sales of Succession property, made pursuant to an order or decree of any court of the State, a commission of not more than two *per cent.* on the first ten thousand dollars, and one *per cent.* on the excess." Act 104 of 1896, p. 153.

This statute is an amendment of Revised Statutes, Section 160, which provides that "no auctioneer shall demand and receive a higher compensation for his services than a commission of two and a half

*per cent.,* on the amount of *any sale,* public or private, made by him," etc.

It will be observed upon comparing the two statutes, that the phrase "the amount of *any sale,*" occurring in the Revised Statutes, has been so altered by the statute of 1896, as to read "*on all sales,*" and that his commissions "on sales of succession property" have been reduced to "two *per cent.* on the first ten thousand dollars, and one *per cent.* on the excess."

It is plain that the compensation of the auctioneer under the last statute on the subject, on all sales of succession property, is fixed at the *per centum* therein designated upon the *amount* of proceeds realized thereby, and not by the *number* of separate adjudications.

In Succession of Macarty, 32 Ann. 6, our predecessors interpreted Revised Statutes, Section 160, above quoted to mean, that, for his services an auctioneer is entitled to a commission of two and one-half *per cent* on "the *entire amount* of the sale."

And this court recently construed that provision of law to apply to the case of an auctioneer who had made sales of eighteen different pieces of succession real estate. Succession of Von Hoven, 48 Ann., 620.

But, since the Succession of Macarty was decided, the legislature has put its interpretation of the Revised Statutes, Section 160, beyond cavil or question by its enactment of 1896.

We think it evident that this item of auctioneer's fees should be further reduced, so as to award him the sum of only three hundred and fifty dollars and thirty cents, instead of six hundred and twenty-five dollars and seventy-five cents, as charged in the executor's account.

### III

The next item of opposition to which our attention is directed, is the charge made by the auctioneeer for advertising; and, as included with his commissions, aggregates the sum of two thousand, one hundred and twenty-nine dollars and thirty-nine cents, as stated in the account.

The counsel for opponents have made in their brief a careful compilation of the facts appearing in the record, applicable to their contention, and we have extracted same from their brief, after verifying the correctness of their quotations as follows, viz.:

"The charge of the auctioneer was for six advertisements, at seventy cents a square. It should have been for FIVE advertisements only, at the rate of seventy cents a square for the first insertion, and twenty-five cents a square for each subsequent insertion, as follows:

Bill A.: Picayune:

| | |
|---|---:|
| 56 squares at 70 cents | $ 39.20 |
| 48 squares at 25 cents each, 4 times | 48.00 |
| | $ 87.20 |
| Amount charged by auctioneer | $217.70 |
| Amount allowed by law | 87.20 |
| Amount overcharged | $130.50 |

Bee:

| | |
|---|---:|
| 50 squares at 70 cents | $ 35.00 |
| 42 squares at 25 cents, 4 times | 42.00 |
| | $77.00 |
| Amount charged by auctioneer | 203.00 |
| Amount allowed by law | 77.00 |
| Amount overcharged | $126.00 |

| | | |
|---|---:|---:|
| Total amount of Bill, p. 57 | | $581.05 |
| Less overcharges, printing | $130.50 | |
| Less overcharges, printing | 126.00 | |
| Less overcharges, commission | 19.35— | 275.85 |
| As the bill should be | | $305.20 |
| The lower court made a reduction of | | 128.37 |
| There should be a further reduction of | | $176.83 |

Bill B, Picayune:

| | |
|---|---:|
| 90 squares at 70 cents | $ 63.00 |
| 90 squares at 25 cents, 4 times | 90.00 |
| | $153.00 |

Succession of Rabasse.

Amount charged by auctioneer.............................382.50
Amount allowed by law ................................ 153.50

    Amount overcharged ...............................$229.50

Bee:
53 squares at 70 cents.....................................$ 39.20
56 squares at 25 cents, 4 times ......................... 56.00

🖉 ⸱⸱ ⸱ ⸱
                                        $95.20

Amount charged by auctioneer.............................$224.00
Amount allowed by law ................................ 95.20

    Amount overcharged ...............................$128.80

    Total amount of Bill, p. 58...........................$1,522.43
Less overcharges, printing ......................$229.50
Less overcharges, printing........................ 128.80
Less overcharges, commission..................... 275.45— 633.75

As the bill should be......................................$888.68
The lower court made a reduction of...................... 298.45

There should be a further reduction ......................$590.23

"These rates of advertisements have been maintained in Succession of Von Hoven, 48 An. 620, after a long argument."

In support of their contention, opponent's counsel cite the provisions of the following statutes, viz.:

"That the costs of such advertisements shall not exceed in the Parish of Orleans the rate of seventy cents *per square*, or fraction thereof, for the first insertion, and twenty-five cents for each subsequent insertion. * * *" Sec. 18, Act 49 of 1877, p. 62.

"That judicial advertisements shall be made by publication in a daily paper on three different days before the expiration of the term fixed by law, if the term be of ten days; and for those advertisements for which the term of thirty days is fixed, it suffices if they are published in a daily paper, once a week, during that term." Act 104 of 1878, p. 157.

"That said publication in the French language shall be made in precisely the same manner and for the same number of times, and on the same terms as by existing laws are required or may be required thereafter, for the publication of judicial advertisements in the English language." Section 2. Act 125 of 1888, p. 186.

The total amount charged for advertising in the *Bee* and *Picayune,* aggregate one thousand, five hundred and twenty-two dollars and forty-three cents, and upon this, the judge *a quo* made a reduction of two hundred and ninety-eight dollars and forty-five cents; and our examination has led us to the conclusion that there should be a further reduction of sixty dollars and eighty cents—thus making a total reduction of three hundred and fifty-nine dollars and thirty cents.

In adopting this estimate, we are following the declaration made by this court in the Von Hoven case cited *supra* (p. 627), as follows, viz.:

"We think the rates charged for advertisements entirely unwarranted. The law is perfectly plain on that subject. The charge for judicial advertisements is seventy cents a square for the first insertion, and twenty-five cents for each subsequent insertion, whether made consecutively or not. There is but a single first insertion in a judicial advertisement; all others following the first, are 'subsequent insertions.' The doctrine of 'alternative first insertions,' reached by making the advertisements non-consecutive, and charging each first insertion of a renewal advertisement as an *'alternate first insertion'* may be satisfactory to the newspapers, but not to litigants, and is sustained by no law."

## IV.

The next item of the account opposed is the amount of twelve hundred dollars, charged against the succession, as the sum which the executor had contracted to pay a security company for furnishing surety upon his bond.

This item is opposed upon the ground that the charge is not warranted by the provisions of the code, and not sanctioned by the jurisprudence of this court; and, as establishing that proposition, counsel for opponent cite the following authorities, viz.: C. C. 1683; 1200; 1069; 1194; Succession of Milne, 1 Rob. 400; Succn. of Sprowl, 21 An. 544; Succession of Day, 3 An. 624; Succession of Poindexter, 19 An. 24; Baldwin, Ex's. vs. Carleton, 15th La. 398; Succession of Key,

5 An. 568; City of New Orleans vs. City of Baltimore, 15 An. 625; Succ'n. of Liles, 24 An. 492; Young vs. Chancy, 3 La. 464; Succ'n. of Turnell, 34th An. 889; Succession of Boyer, 36th Ann. 515.

Upon this subject our learned brother of the District Court made an elaborate statement of the reasons which impelled him to approve this item of the account, as a just charge against the succession, and we have made the following extract therefrom as fairly illustrating the views he entertained, viz.:

"The executor credits himself with twelve hundred dollars paid, as provided by him to obtain a suret·· upon his bond as executor. The heirs resist the charge as an illegal one; it is argued that *no law authorizes such a charge* and *ergo* it should be rejected.

"Prior to the Act No. 41 of 1894 the law exacted *personal* security, such as the Civil Code provides for. Said act authorizes surety companies, under certain guarantees, to underwrite as surety upon bonds *in lieu* of personal security, and *authorizes such companies to charge for the service.* Since then, we find said corporations have been accepted as sureties on *all* bonds required by law, such as official bonds, warehouse bonds, builders' and contractors' bonds, and bonds in succession matters.

"In the rush of modern business, suretyship has become a *fixed subject matter of covenanting by the policy of the law.*

"It appears in this case that the executor, holding the power of attorney of an heir, was appointed dative executor, and he gave the bond, which was for a large amount, the inventory amounting to about $100,000. Several months after he had given said bond, the sureties on his bond having the legal right so to do, announced their purpose to withdraw from the bond. Litigation of a serious nature had arisen, and it had become evident that it might require several years, as has proved to be the fact, to wind up the affairs of the succession. Thus confronted by the certainty of being left without a bond, and by the certainty that it would be difficult and perhaps impossible to find personal security for so large an amount, say more than $120,000, for the length of time, perhaps years, that would be required to settle the litigation pending, and close the succession, and *particularly* after sureties upon the bond which had been given had become *alarmed and withdrawn* from his bond, what recourse had the executor but to apply to a surety company, which the Act No. 41 of 1894 had legalized, and recognized as a proper and competent surety?

"He must either do this or give up the trust. Fairness must concede that this latter was a harsh condition. He had embarked on his duties, and had incurred responsibilities. He had the right to earn This commission by full administration. He held the mandate of an :absent heir having a large interest. It was not a certainty that any other representative of an absent heir *could* give a bond, at least without paying for the surety, as per said Act No. 41 of 1894. The public administrator, always ready, had previously intervened in the succession and would perhaps succeed to the trust with his statutory charges of 5 *per cent.* commissions on the inventory, 5 *per cent.* more on collections, with new attorney's fees, new costs of inventories, publications, etc. It was *ergo* to the evident interest of the succession that the dative executor should remain in office.

"It is proved by Mr. Pescud that the surety company would have charged 1 *per cent.* for the first year of administration and 1-2 of 1 *per cent.* for each succeeding year. The succession is not yet closed, and we are in the third year of the administration, with the certainty of another appeal to the Supreme Court, just now adjourning until the late autumn, and the probability, therefore, of four years of administration, before this succession can be closed.

"In this contingency, a charge of 2 *per cent.* on the amount of the bond of $120,000 or upwards was a *certainty* if the executor followed the law and contracted under it (the Act of 1894) with a surety company. It was almost as certain that 1-2 *per cent.* more would have resulted as the charge, and possibly 1 *per cent.* more—*i. e.,* 2 1-2 *per cent.* or 3 *per cent. on the $120,000 bond.*

"The alternative *then* was the public administrator's commission of 5 *per cent.* on the *inventory,* and 5 *per cent.* on collections, etc., *on the one side,* or the surety company as a bondsman at 2 *per cent.* on the amount of the bond at least *on the other side,* or to give up the trust and take the chances of another representative of the absent heirs applying and giving bond.

"The chances were that any other representative of an absent heir would *have equally to pay for a surety,* and as the charges of the surety company *were about equal to what an executor would* receive for *his commissions,* the chances were that no absent heir's representative would have made the application or have given the bond.

"In this dilemma, the executor engaged a sufficient and solvent

surety by contracting, as executor, to pay 1 *per cent.* for the surety-ship.

"This suretyship was to last during this entire administration.

"That this was the best he could do is established. That it was economical the figures show, for while 1 *per cent,* is $1200, the surety company would have charged $2400 or perhaps $3000, and the public administrator's fees, *by law,* would have been $4000, at least.

"That it was prudent, for the *interest of all,* appears *in the fact* that to begin *de novo* with inventories in all the parishes, new notices, new delays, new letters, new attorneys and consequent fees, would have cut the estate (I doubt not) $1200, which is all that this executor had to agree to.

"If he had to pay this personally, it will eat up the greater part of his commission. If it be divided out among the several heirs, the charge upon each heir will not be much, and they are *all, as a matter of good fortune; and not by the will of the testator,* receiving amounts which in France will be regarded as large, and which, here, are very considerable. None of them have been at any trouble, and all of them are to receive, liberally, as the result of the active executor and his attorney, who have defeated claims and saved to the estate $50,000, at least, equal to 250,000 francs in France

"The security was for the benefit of the estate. It secures creditors, and it secures the heirs. It benefits the executor *only,* as it enables him to earn his 2 1-2 *per cent.* commission, and *surely he* has earned it.

"It seems to me, on every view of the matter, that the succession which gets the almost entire benefit, should pay the 1 *per cent.* charge for the surety, and for the guarantee that the succession would suffer no loss.

"The only argument against the view is that *no law approves* it. The Act No. 41 of 1894 is a good reply to this argument.

"This act authorizes the acceptance of the company or corporation as a legal surety, and authorizes the company or corporation to charge a premium or commission for taking the risk, and where the law accords the right it necessarily *allows all that is necessary to avail of the benefits of such rights.*

\*          \*          \*          \*          \*          \*          \*          \*

"The law has announced *as its policy* in the Act No. 41 of 1894, that furnishing surety, on such bonds for a money consideration, *as a matter of business* enterprise, is legitimate business. The conclusion

seems to me fair and just, that where good security, at fair and reasonable and economical rates, is obtained, that the succession which is thus secured against the acts of the executor ought to bear the charge.

"Such was the view taken by the Wisconsin court in Hanacker vs. Commercial Bank, 70 N. W. Reporter, p. 295. But if I am wrong in these views, I must not forget that as Mr. Cleveland said of the tariff: 'We are not dealing *here*,' under the peculiar facts of this case, '*with a theory, but with a condition.*' Each case has its peculiar facts and conditions. Every rule has its exceptions. In this case *justice approves* the charge, and equity applies *when law is silent*, and especially in matters of accounting, which is of chancery origin.

"I therefore overrule the opposition to this charge of $1200."

The foregoing reasons and course of argument are cogent and persuasive, and would exercise a strong influence on our decision, if we found any authoritative sanction therefor in either the statute or decision cited; but, in our opinion, there is none in either.

The title of the statute referred to is as follows, viz.:

"An act to authorize certain corporations to become surety upon " bonds required to be furnished by law, and prescribing the condi- " tions under which they may do so "

Section one provides, amongst other things, "that hereafter, any " corporation duly incorporated * * * for the purpose of trans- " acting the business of guaranteeing the fidelity of persons holding " places of public or private trust * * * may be accepted as sole " and sufficient surety upon any bond," etc.

Section two provides, amongst other things, that "it shall be lawful " for any party of whom such a bond or understanding is required, to· " agree with such company, acting as surety for the deposit of any and " all moneys, etc."

Similar provisions occur, in the following sections of the act; but in concluding section (9), we find the following pertinent expression, viz:

"That this act is not intended in any manner, except as above pro- " vided, to change existing laws on the subject of suretyship, and ex- " cept to permit such a company to act and be accepted as a sole surety " on all bonds, etc." Sec. 9, Act 41 of 1894.

It is a statute appertaining to the subject of suretyship, and possessing no pertinency to the duties, powers or responsibilities of executors or administrators, or the management or the administration of

successions; and for that reason we think it altogether inapplicable to the question under consideration.

In our view, the case stands in the same position as it would if a private person, *sui juris,* had made a similar engagement to become surety upon the bond of the executor for a consideration; and that the succession incurred no other or greater responsibility to the executor therefor.

The case decided by the Wisconsin Court was under a special statute which differs widely from the Act of 1894.

For these reasons, we are of the opinion, that the succession can not be called upon to reimburse the executor the sum expended by him in procuring the guaranty company to become surety on his bond; and in this respect the opposition must be sustained and the claim of $1200 rejected and disallowed.

## V.

The next item opposed is that of attorney's fees which are placed on the account, at the total amount of $11,421.63.

This sum is equal to ten *per cent.* on the total amount of the original inventories.

It appears that the sum of $5000 was placed on the provisional account of the executor, and that same was allowed by the court *a qua* and paid without opposition by the heirs; but they oppose the further allowance of $6,421.63 as being excessive.

Our learned brother of the District Court made a very exhaustive examination and analysis of this question, and we make the following excerpt from his written opinion, as illustrating his views, viz:

"This succession record on file has grown into large proportions, and the official books of the executor and his vouchers and memoranda which have been called for and produced have gathered equally in volume, and these attest the *constant* attention that has been required and the faithful attention that has been given to all and singular the numberless details, great and small, of the business of this succession here, and in the several other places where it had property interest.

"As I have stated, the heirs at law are collateral, not close in degree of relationship, who live abroad, who have come to the inheritance only by the death of the legatee named in the will, prior to the death of the testator, and who were virtually strangers to the deceased.

"There are no widow, no minors, no ascendants, no brothers, no sisters *here*.

"All these facts impress me with the firm conviction that in this solvent and valuable estate, neither the law nor a sound public policy require at my hand, any illiberal or narrow, or strict construction, against the executor or against his counsel.

"Judged by the *volume of the estate*; judged by the important and complicated litigation that has been managed; judged by the success which has attended 'the efforts of the executor and his attorney in defeating claims urged with the persistence and plausibility of appearance, and by able and skillful counsel, claims amounting to more than $50,000; judged by the benefit that enures, and has enured to the collateral heirs, to whom this succession has proved a windfall or stroke of fortune; judged by the important questions of law that have been met and dealt with, I think that the fees of the attorney of the executor are fair and reasonable, and just."

But, on the other hand, counsel for the opponents make this rejoinder to the argument of the district judge, viz:

"That while various suits were brought against the succession, aggregating $66,800, and that nearly all of them were defeated, that those defeated were so defeated by the mutual efforts and learning of other counsel in part, who were employed for their defense, and co-operated with the attorney of the executor."

These suits and various other matters of litigation brought this succession before this court several times, and its records attest the labor, skill and learning with which the attorney for the executor and other counsel, who co-operated with him successfully, protected the estate from spoliation, and hence, we are able to judge, from our own standpoint of observation, of the value of these services.

Jurisprudence has settled the rule, and consecrated it, that the *quantum* of attorneys' fees in any case where the services have been performed in the presence of the court, which is called upon to decide the question, is a matter of law, rather than one of fact, and which the court will value as its opinion may dictate, rather than base its judgment upon the opinion of witnesses.

Counsel say in their brief:

"In the Bank of Commerce case, 49 Ann. 1060 (1074), this court quoted approvingly the decision in the Succession of McCarthy, 2 Ann. 518.

"As the services to be compensated are rendered under the eye of " the court, the taxations ought to be made on its own responsibility, " which ought not to be shifted from the bench on the bar, as appears " to have been done in this case, in which the decision is made on the " opinion of the attorneys, that the charge is moderate, and but reas- " onable." Succession of Caballero, 25 Ann. 647. The Supreme Court will fix attorneys' fees without regard to the opinion of wit- nesses. Randolph, Singleton & Brown vs. Carroll, 27 Ann., 467; Dorsey vs. Creditors, 5 N. S., 399; Succession of Mayer, 12 R., 414; Uzee vs. Biron, 6 Ann., 565.

"In the Bank of Commerce case, the amount distributed by them upon their account was $189,746.31. Yet the commissioners were al- lowed only $2000, and the attorneys $5000; and this court said it was 'more than we should allow if the allowance was open to review.' "

*Per contra* we have this statement from the counsel of the executor's attorney, viz:

"If your Honors are with us on the proposition that the $5000 fee was for services allowed on the provisional account, and being un- opposed, it should not be considered in fixing the value of services subsequently rendered, then we present to the court a unanimity of opinion which is seldom equaled. For all the attorneys called as wit- nesses agreed as to the correctness of the amount for which our client is placed on the final account, the judge *a quo* agrees, and counsel for opponents practically do so. It is therefore unnecessary to go into details; it is unnecessary to show that the percentage of the value of an estate which it cost to save it from a horde of forgers and dishonest claimants is not necessarily an indication that the charges are ex- cessive.

"Before closing, we quote from the *syllabus* in the opinion in the Succession of Richards, 49 Ann. 1115.

" 'The estimation of the value of professional services of an attorney- at-law is only a question of law, and one that comes peculiarly within the province of the judge *a quo* who superintended the making up of the record upon which same must necessarily depend, giving him a very intimate acquaintance with all of its details, as well as knowledge of the kind and value of what services were performed. In such a case, this court will accept his estimation as a correct and proper one, in the absence of any manifest error of judgment on his part.' "

In each of these cases—Succession of Richards and Bank of Com-

merce—we affirmed the judgment of the lower court for reasons as assigned in the foregoing quotations therefrom, that is to say, that the litigation in which the services of the attorneys were rendered was *solely* conducted before the district judge, who was called upon to estimate their value.

But the instant case is different, in that the litigation in which the attorneys' services were rendered was conducted, in great part, before this court, finally.

Applying this test to the question before us, it is our deliberate conviction, that the amount placed upon the account, and allowed by the judge *a quo,* is excessive, and should be reduced to the sum of six thousand dollars, in full for all attorney's fees, and that as thus reduced this item of the account is approved and allowed.

## VI.

The remaining question is, whether the executor is entitled to the commission he has placed upon the executor's account, for the collection of rents, amounting to the sum. of $170.

The judge *a quo* approved this item, and rested his decision, mainly, upon Succession of Robertson, 49th Ann. 80, and the cases therein cited, and on Hale vs. Salter, 25 Ann. 323, and Succession of Hopkins, 23 Ann. 1166.

The case presented in the Succession of Robertson, was exceptional, the surviving widow and executrix having by her unaided exertions increased the sale value of the estate from $12,000 to $41,000, and in addition, she had accumulated over $6000 of *net* earnings for the succession, within the brief period of eight months. Under these circumstances, we thought her equitably entitled to five *per cent.,* but upon this last amount only. But in so deciding that case, we did not propose to establish any new precedent, nor to depart from the precepts of the Code and our jurisprudence, which were therein quoted and approved; but merely to apply the maxim of equity to a case we regarded as *sui generis,* as those cited and relied upon were.

But the instant one is not such a case, and it finds neither support nor application in the Robertson case. Hence the opposition to this item is well grounded, and must be sustained.

After a careful examination of this record, and the various contentions of counsel *pro* and *con,* we have reached the conclusion that the

account of the executor should be amended and restated in conformity with the views herein expressed.

It is therefore ordered and decreed, that the opposition of the heirs be sustained in the amounts and particulars hereinabove set forth, and that the cause be reinstated and remanded to the District Court with directions to the effect that the testamentary executor restate and correct his final account so as to conform to the law and the views herein expressed; and that costs of appeal be taxed against the several appellees personally and proportionately.

## ON APPLICATION FOR REHEARING.

WATKINS, J. The reduction which the court intended to make in the original decree, and which the court did make in the matter of fee of attorneys for the succession was, from $11,421.63, to $6000; and this was intended to include all services rendered by the attorneys for the succession of any and every kind.

However, the court, having reconsidered its original decree in this respect, has concluded to increase the amount heretofore allowed for attorney's fees from $6000 to $7500; this to include all fees inclusive of the $5000 which were allowed and placed upon the executor's provisional account, and since paid.

We do this, only because counsel representing opponents, in argument and brief, express themselves as satisfied if the court would reduce the fee of the attorney of the executor from $11,421.63 to $7500.

With reference to the payment of Mistress Hippolite Bossu, one of the legal heirs of the deceased, counsel claim, that she is bound by a contract entered into by her agent with Danziger & Stern, to the extent of her interest in the succession of Rabasse; and that she is accordingly bound for the sum of $600, same being one-half of the amount paid to the sureties on the executor's bond.

This contract has not, heretofore, been pressed upon the court's attention, and we, therefore, think it unnecessary to re-open the decree in so far as relates to this claim. But we will reserve to Danziger & Stern all rights they may have under their contract in respect to Mistress Bossu.

It is a question which can well be settled between them, and which need not enter as one of the factors in our present opinion.

It is therefore ordered, adjudged and decreed that our original de-

cree be and the same is hereby amended so as to increase the amount of attorney's fees for all purposes, from $6000, the amount allowed in the original decree, to $7500: and to reserve the rights of Danziger & Stern under their alleged contract with Mistress Bossu, or her agent, for any amount they may be entitled to recover thereunder.

It is further ordered that our original judgment, as thus amended, remain undisturbed, and that a rehearing be refused.