(48 South. 162.)

No. 16.983.

VILLERE v. NEW ORLEANS PURE MILK CO., Limited.

(Nov. 4, 1908. Rehearing Denied Jan. 18, 1909.)

1. RECEIVERS (§ 105*)—CONTINUING BUSINESS WITHOUT AUTHORITY — LIABILITY OF RECEIVER.

When a receiver continues temporarily, without the court's order and authority, the operations of a company placed in its charge, as a going concern, and thereby sustains a loss of $704, that loss cannot be made to be borne by the mass of creditors. It must be borne by the receiver, and the amount of the same deducted from the commission otherwise falling to him.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 105.*]

2. RECEIVERS (§ 96*)—EMPLOYMENT OF AN ATTORNEY.

It is not the practice in Louisiana for a receiver to apply for authority to employ an attorney, or for the receiver to consult the court as to what attorney he should employ. The fact that a particular attorney may have individual interests involved in the matters embraced in the receivership does not, ipso facto, cut him off from being employed as the attorney to conduct the receivership proceedings. That fact, however, affects the fee which he will be entitled to receive for his services.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 180; Dec. Dig. § 96.*]

3. RECEIVERS (§ 92*)—CONTINUING BUSINESS—ORDER.

An order of court appointing a receiver to a corporation, "with power to administer its affairs for the best interest of all parties," does not confer upon the receiver the authority and power to continue the operations of the company and incur liabilities as a going concern. Authority for such purpose must be given in express and precise language.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 169; Dec. Dig. § 92.*]

4. CORPORATIONS (§ 186*) — STOCKHOLDERS — DEALINGS WITH CORPORATION.

A stockholder of a corporation may advance money to it, may become its creditor, may take from it a mortgage or other security, or may indorse same like any other creditor, but always subject to severe scrutiny under the obligation of acting in the utmost good faith. Cotton Seed Oil Co. v. Refining Co., 108 La. 74, 32 South. 221.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 700; Dec. Dig. § 186.*]

5. CORPORATIONS (§ 565*) — RECEIVERSHIP — CREDITORS—WHO ARE.

Parties who contract to take stock in a corporation for and in consideration of personal services to be rendered by them, who render such services and become entitled to the stock, do not become creditors of the corporation by reason of the fact that the company is placed in the hands of a receiver before the stock is in fact issued.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 565.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; George Henry Théard, Judge.

Action by Octave J. Villere against the New Orleans Pure Milk Company, Limited. Judgment for defendant, and plaintiff appeals. Amended, and, as amended, affirmed.

Omer Villeré, for appellants the receiver and the mortgage creditors. Morgan & Milner, for appellants W. T. Carey & Bro. and Charles J. Babst. Richardson & Soulé, for appellants William E. Hall and sundry creditors. Harry Hinckley Hall, for appellants German-American Savings Bank & Trust Co. and Omer Villeré. Guy Morville Hornor, for appellee M. D. Lagan, Ltd., in liquidation. Asahel Walker Cooper, for appellee the Walsh & Weidner Boiler Co. Gustave Joseph Ricau, for appellee Andry & Bendernagel. Charles Rosen, for appellee Alfred Raymond. Denègre & Blair, Victor Leovy, Bernard Bruenn, John Wagner, and Rouse, Grant & Grant, for appellees interveners.

NICHOLLS, J. On the 10th of September, 1906, the plaintiff, Octave J. Villere, filed a petition in the civil district court (verified by his oath) in which he averred that he was the holder and owner of 150 shares of stock in the New Orleans Pure Milk Company, Limited, a corporation organized under the laws of this state, and domiciled in this parish; that he was also an indorser, with others, for the sum of $25,000 on a certain demand note of said corporation; that said corporation was hopelessly insolvent and unable to pay its debts, and that the present condition of affairs did not justify a continuation under the present management; that

it was to the interest of the stockholders and creditors that a receiver be appointed to said corporation, and that the German-American Savings Bank & Trust Company, be appointed receiver; that said corporation is mismanaged.

In view of the premises, petitioner prays for citation of the New Orleans Pure Milk Company, Limited, through its president, George A. Villere; that after due proceedings a receiver be appointed to said corporation for the purposes of administering its affairs, under the order of this honorable court; and petitioner prays that after due time the said corporation be fully and finally liquidated and dissolved; that the German-American Savings Bank & Trust Company be appointed receiver, and that petitioner be recognized as a creditor aforesaid.

And he prayed for all general and equitable relief.

On the 11th of September the defendant company, through its president, George A. Villere, filed an answer to this petition, in which it averred that at a meeting of its directors held the 11th of September, 1906, it was unanimously resolved that said corporation was unable to meet its obligations as they matured, or to carry out existing contracts, and that a receiver was necessary to preserve and administer its assets for the benefit of all concerned, recommending, in the event the court deemed such receiver necessary, the German-American Savings Bank & Trust Company as such receiver, the whole as is more fully set forth in the annexed certified copy of the minutes of said meeting of the board held as aforesaid.

In view of the premises, respondent submitted the matter to the court for such action as it deemed proper, and prayed for all general and equitable relief.

The copy of the meeting of the directors of the company annexed to this answer was as follows:

"New Orleans, Sept. 11, 1906.

"Office of the New Orleans Pure Milk Company, Ltd.

"A special meeting of the board of directors of the New Orleans Pure Milk Company Limited, was held this day, President Villere presiding, with a quorum present. Whereupon it was moved by Wm. F. Voorhies, and duly seconded, and unanimously

"Resolved, that owing to the financial condition and situation of this corporation, its inability to meet its obligations as they mature, or to carry out its existing contracts, and in view of the further fact that suit had been instituted against it by Octave Villere, it was the sense of this board that a receiver was necessary to preserve and administer its assets for the benefit of all concerned, and that this board recommends to the court for appointment the German-American Savings Bank & Trust Company, as receiver.

"(Signed)             Geo. A. Villere.

"Certified L. L. Lamothe, Secty.      [Seal.]"

Accompanying this answer was the following statement:

Balance Sheet.

New Orleans Pure Milk Company, Limited.
New Orleans, La.

At Close of Business August 31st, 1906.

### Assets.

| | | |
|---|---:|---:|
| Cash | $327 | 43 |
| Accounts receivable, sundry debts.. | 9,670 | 65 |
| New Orleans Plant (real estate, building, property, machinery, etc.) | 85,637 | 58 |
| Hammond Plant (real estate, farm buildings, property, etc.) | 27,672 | 10 |
| Supplies, butter and feed | 925 | 78 |
| Unexpired insurance and taxes | 606 | 55 |
| Office furniture and fixtures | 466 | 35 |
| Deposits and guarantees | 17 | 50 |
| Good will, etc., and establishing business | 9,708 | 00 |
| Stock in Hammond Planting & Mfg. Company | 300 | 00 |
| Total assets | $135,332 | 49 |

### Liabilities.

| | | |
|---|---:|---:|
| Account payable sundry creditors, estimated | $7,411 | 93 |
| Account payable, sundry creditors, for contracts on building, machinery, estimated | 29,954 | 55 |
| Notes payable—mortgage | 1,440 | 49 |
| Notes payable—mortgage | 25,000 | 00 |
| | $63,806 | 97 |
| Capital stock | 97,000 | 00 |
| Total liabilities | $160,806 | 97 |
| Aug. 31, 1906, excess of liabilities over assets, or loss | $25,474 | 48 |

On the same day, the judge of division E of the civil district court signed the following order:

"Let the German-American Savings Bank & Trust Company be appointed receiver to the New Orleans Pure Milk Company, Limited, with power to administer and manage its affairs for the best interest of all parties upon giving bond for fifteen thousand dollars, and until further orders of this court, let all proceedings by other persons against said New Orleans Pure Milk Company, Limited, be stayed."

The German-American Savings Bank & Trust Company qualified as receiver, under the order and letters of receivership issued to it, on the 21st of September, 1906.

On the 17th of September, 1906, the court ordered, upon the petition of the receiver, that an inventory be made of the property of the milk company in the parish of Orleans, and on the 19th of September the court ordered that an inventory be taken of the property in Tangipahoa parish.

These inventories were made on the 26th of September in both parishes. The property inventoried in the parish of Orleans was appraised at the sum of $36,998. Of that amount there appeared to be then on hand in cash the sum of $1,856.46. The property in Tangipahoa parish was valued at $8,241.

On the 26th of September the receiver filed a petition in which it alleged that there was no prospect of working the company out of the debt, and that the interest of all parties concerned would be best subserved by selling all the assets and business of said company in block as a going concern at public auction for one-half cash and the balance at one year's credit. It prayed accordingly.

The court on the same day granted the order prayed for. On October 4th, W. T. Carey & Bro. filed a petition of intervention and opposition, in which it averred that it was a privileged creditor of the pure milk company in the sum of $13,320 for the causes therein stated. After setting out what it claimed to be its rights as a creditor, it averred that on September 10, 1906, Octave J.

Villere, representing himself to be a stockholder of the New Orleans Pure Milk Company, Limited, filed a petition in which he alleged that that company was hopelessly insolvent, and that it was to the interest of the stockholders and creditors that a receiver be appointed. That on September 11th the company filed a copy of a resolution said to have been passed at a special meeting that day, to the effect that the corporation was unable to meet its obligations, and submitting the matter to the court for adjudication. That it also filed a balance sheet of the company of August 31, 1906, showing $135,132 of assets, and only $68,806 of liabilities; but in order to make it appear insolvent, it put down the amount of capital stock alleged to have been issued at $97,000.

That upon this showing the court appointed the German Bank & Trust Company receiver. That said entire proceedings were irregular, null, and void, and showed on their face that said corporation was not insolvent.

That the court was not authorized by law, and particularly Act No. 159, p. 312, of 1898, to appoint a receiver at the instance of a stockholder upon the allegations contained in the petition, but was only authorized to appoint a receiver at the instance of a creditor when the board of directors shall declare by resolution that the corporation is unable to meet its obligations as they mature, and that a receiver is necessary. That the order appointing a receiver was improvidently granted, and should be vacated. That said O. J. Villere does not appear by charter to have been a subscriber to the stock of said corporation; and they generally denied that the outstanding alleged issue of stock was issued legally, or that the corporation received a valid and legal consideration for same, as required by the Constitution of the state.

That on September 26, 1906, before the inventory of the property rights and credits of the corporation had been filed, a petition to sell all the assets of the corporation was filed,

and said petition was still pending upon the receivership order book. They opposed the granting of such order on the ground that examination into the affairs of the corporation will show that there is reason to believe that an aggressive administration of the corporation will enable it to pay its debts; that no price was put upon the property; that the petition was ill advised and hasty, and the only effect of a sale under it will be to allow the property to be sold for an insignificant price, and permit interested parties and speculators to acquire it at a price that will not pay the bona fide obligations of the corporation or petitioners' debt; that the inventory filed did not appraise the property at its true value. They denied that the alleged mortgage of $25,000 was a legal and bona fide indebtedness of the corporation, or that there was any necessity to sell all the assets of the corporation.

They prayed that Octave J. Villere, the New Orleans Pure Milk Company, and the German-American Bank & Trust Company, receiver, be cited; that the order appointing a receiver be rescinded, and the appointment vacated; that the petition to sell all the property of the corporation be denied; that intervener be declared a creditor of and have judgment against the New Orleans Pure Milk Company, Limited, for the sum of $13,322, with legal interest from judicial demand, and recognizing interveners' first lien and privilege upon the building and lot of ground described in their petition; that after due proceedings the property be sold to pay their debt.

About the same time a number of other parties (among others, Charles J. Babst), alleging themselves to be privileged creditors of the pure milk company, filed interventions setting up their respective claims, and praying recognition and enforcement of the same, accompanying the same with oppositions of like character as that of Carey & Bro. The claims set up in these various petitions of intervention and oppositions will be hereafter returned to, as well as the answers thereto and the issues raised thereby.

On October 12, 1906, on motion of counsel representing Carey & Bro. and Charles J. Babst, suggesting that the receiver had not filed a statement of the debts and liabilities of the corporation in spite of amicable demand, and that there was then pending a suit to vacate the receivership and the order of sale of the assets of the defendant corporation, and that it was proper that monthly statements should be filed by the receiver, and that the receiver had administered the property of the defendant for a month, the court ordered that the receiver show cause on October 19th why it should not furnish a statement of the debts and liabilities of the defendant, and why it should not file an account of administration up to date.

On the 15th of October the receiver answered the intervention and opposition of Carey & Bro. Among other allegations of this answer, the receiver denied that the pure milk company could possibly be administered so as to enable it to pay its debts within a reasonable time. It declared that he filed that day, as an exhibit in its answer to the petition and opposition of Charles J. Babst, a detailed statement of the liabilities of the corporation which it verily believed to be correct, which statement showed liabilities to the amount of $58,375.98.

It denied that the appraisement made by the sworn officers of the court was too low, and doubted that said property would sell for its appraised value, whether sold by an auctioneer or by the civil sheriff at public auction.

It averred that it firmly believed that if said property was sold in block as a going concern it would sell for more than if it was dismantled. It declared, however, that it submitted the whole matter to the court, and prayed for such orders and decrees as the nature of the case and equity would permit,

and for general relief. The receiver made similar allegations in its answer to the intervention and opposition of Charles J. Babst. On the 22d of October, 1906, the receiver filed a petition in which it declared that, in compliance with the decree of the court of the 19th of October, it filed a statement of its gestion of the defendant corporation showing:

First. Statement of receipts and disbursements from September 11th to September 30th.

Second. Statement of receipts and disbursements from October 1st to October 30th.

Third. Trial balance September 30, 1906.

Fourth. Statement of revenues and expenses from September 11th to September 30th. It prayed for such orders and decrees as the nature of the case might require, and which the law and equity would permit, and for general relief.

On December 6, 1906, the court declared that, considering the petition of the receiver for the sale, and the consent expressed by the opponents in open court, the sale be ordered in separate lots, ordered that the property described in its order be sold at public auction by an auctioneer to be designated by the receiver, the sale to be made in lots after being separately appraised and divided.

In the meantime, on October 25, 1906, W. T. Carey & Bro. and Charles J. Babst had filed a petition to the court in which they averred that they were large creditors of the pure milk company. After reciting the fact that the German-American Savings Bank & Trust Company had been appointed receiver of that company, it averred that the said receiver should be removed for the following causes:

First. Because, although the balance sheet of the New Orleans Pure Milk Company, Limited, at close of business August 3, 1906, filed by defendant corporation, showed assets of $135,332, with only $63,806 of liabilities, said receiver within 15 days after its appointment, averring that the interest of all parties concerned "would be best subserved," petitioned the court for an order to sell "all the assets and business of said company as a going concern." Petitioners and nearly all the large creditors of the corporation, with the exception of those claiming to be mortgage creditors, opposed the granting of such an order, and that it was an act of mismanagement of the affairs of the corporation and against the interest of all parties, save those claimed to be mortgage creditors, to ask for such an order.

Second. That said receiver had undertaken, without applying to the court for special authority, to disburse since its appointment over $8,000 of the money of the corporation; that this disbursement has been made practically in 30 days; that by a sworn statement of its gestion, and as shown by testimony of its trust officer on the rule requiring the filing of said account, it is seen that it is expending about $250 a week on pay rolls, without special authority of the court or showing the necessity therefor, or to whom this money is being paid. That generally, by failing to make application to the court for authority to conduct its administration, it deprived the court, petitioners, and other creditors of knowledge of what was being done with such large sums of money as the expenditures of $8,000 in 30 days.

Third. Because, despite the fact of the charge under oath of mismanagement made by Octave J. Villere in his allegations that the old management should not be allowed to conduct the business of the corporation, the receivership had retained Mr. George A. Villere, president of the corporation, as its manager, at a salary of $150 a month, and had practically retained the old management, so that the affairs of the corporation are practically turned back into the hands of the parties who are charged with so grossly mismanaging its affairs as to necessitate a receiver. That such a receivership is one in name only, and is not being conducted for the best interests of the real parties in in-

terest. Petitioners averred that on the trial of the rule they would show other acts of mismanagement by the receiver. They prayed that the German-American Savings Bank & Trust Company be cited to show cause on November 2d why the court should not remove the receiver. The receiver answered the petition. After pleading the general issue, it averred that, while it was true that the balance sheet taken from the books of the pure milk company showed assets to an amount far in excess of the debt, said assets consisted of the plant and other property of the corporation necessary to carry on its business; that, when respondent asked for the sale of the property of said corporation in bulk as a going concern, it was because it ascertained after a thorough examination that the corporation owed upward of $50,000 as shown by the detailed statement of liabilities; that there were no means of paying said debts except by selling the assets; furthermore, after a careful examination of the business, it was of the opinion (which opinion it still retained) that at a forced sale of the assets the same would certainly not sell at their book value, whatever such value might have been to the corporation; that it was then, and was still, of the opinion that there was no reasonable ground to believe that the property of the corporation could be so administered as to pay its debts, and the possession thereof restored to the corporation; that, whatever may have been the cost or the value to the corporation of its assets, it felt satisfied that unless the corporation could raise the money to pay its debts, either by selling additional stock or borrowing more money, neither of which it could do, its assets would have to be sold, and under the circumstances it was its duty under the statute to apply for an order of sale.

It reiterated the averments it had already made that the interest of all parties concerned would be best subserved by selling all the assets and business of said company in block

as a going concern, as it was, after familiarizing itself with the business of the company of the opinion that said assets would sell for more in block as a going concern than they would sell for if the same were dismantled and sold piecemeal. It is of the opinion that the only way of saving the good will and established business is to sell the property as a going concern. It denied the truth of all the allegations made that the petition for the sale was presented by it against the interest of all parties save those claiming to be mortgage creditors. It alleged: That it had disbursed the sums mentioned in the statement of its gestion, and that the same was properly and necessarily made under the general powers of administration given to it in the order appointing it. That it was true that in order to properly administer the affairs and business of the corporation under the order of the court under the sanction of its oath, and under the obligation of its bond of $15,000 in such time as the court should issue under different order in expending in weekly payments and for the purchase the sums mentioned in the sworn statement of its gestion, and that the said sums are being expended as the necessary consequence of its administration of the affairs of the company, and were being expended in the interest of every and all parties concerned, with the view of keeping the good will and business connections, which are an asset that would otherwise be lost. That it had cut down the expenses of the management of the business to the extent of about $731 per month, as shown by the comparative statement of the pay rolls of the milk company, limited, and those of the receiver, which it embodied in its answer showing the monthly pay roll of the company to have been $2,009, and that of the receiver $1,277, saving $731 under the administration of the receiver. That at the time it was appointed receiver the milk company was under large contracts to furnish milk at 18½, 19, and 20 cents per gallon, and, realizing that

such contracts were losing contracts, it notified all parties that it would no longer furnish milk at less than 23 cents per gallon.

That the charges which were made by the complainants which were reported in the daily press and discussed in the clubs had considerably injured the business of the company, which, from time to time, showed increased loss.

That it was not true that by failing to make application to the court for authority to conduct its administration it deprived the court or any creditor of knowledge of what was being done, inasmuch as all moneys expended were fully set forth in the sworn statement of its gestion which it filed. It averred that neither the complainants nor their lawyers ever applied to it for information, which would have been cheerfully given to all parties interested.

That before the application had been made for a receiver the bank's officer had examined into the affairs of the milk company and had caused its books to be examined by a public accountant. That, when the receiver employed Mr. George A. Villere to attend to certain details of its business under the direction and management of the court, it knew that on account of his integrity and thorough knowledge of this particular business he was a proper and fit person to be employed in such a capacity, and it had besides employed at its own expense, as its representative at the plant, an experienced man to act in conjunction with him who had never been connected with the milk company.

That the allegations that it had practically retained the old management and turned back from the 11th of September, 1908, the administration of the affairs of the company into the hands of those who had been charged with "so grossly mismanaging" them, was unfounded in point of fact, as the management during that time was under the direct charge and supervision of the receiver. That there was no charge that said property had been "so grossly mismanaged" until the same were made by insinuations in the petition of the complainants. That said insinuations were made by parties who had never tried to ascertain the true facts. That when the receiver employed George Villere it knew the management of the milk company had made mistakes, but not that it was guilty of gross mismanagement. It averred that it was absolutely untrue that the receivership was one only in name, and that it was not conducted for the best interest of the real parties in interest.

This application for the removal of the receiver was never brought to trial. There is in the transcript no procès verbal of the sale made under the order of the court which has been referred to. That such sale was made under that order appears to be conceded by all parties, and, as there is no complaint as to the manner, form, and time of sale, it is assumed that the sale followed in its execution the order of the court.

The property seems to have been purchased by Mr. Ratcliffe Irby, whose claim as a mortgage creditor was recognized by the district court, and whose rights as such are contested on this appeal.

On the 19th of April, 1907, the receiver filed a provisional account and tableau of distribution. From the account it appears that the receiver had received the sum of $76,666.26; that it had disbursed at different times $26,276.99; that the receiver proposed to pay to privileged and mortgage creditors $47,039.43—leaving $3,299.84 to be disbursed among the ordinary creditors.

Prior to the order of the court to sell the property of the defendant corporation, O. J. Villere, W. R. Irby, and Omer Villere filed a petition in the district court in which they alleged that they were creditors of the pure milk company in the sum of $8,333 each, or in the aggregate in the sum of $25,000, with 7 per cent. interest from 2d June, 1906, and that as security for said amount they held a

certain promissory note of $25,000 drawn by said company and secured by mortgage per two notarial acts dated June 2d, 1906, and recorded respectively in the parish of Orleans on the same date, and in the parish of Tangipahoa on the 5th of June, 1906.

That they had always been of the opinion, and so expressed themselves freely, that the property of said company would have to be sold at public auction, and that by maintaining the property as a going concern more bidders would attend the sale. That, when the receiver applied for an order to sell the property in block as "a going concern," petitioners made no objection thereto, because in their opinion such a sale would be to the evident advantage of all parties concerned, and principally to the advantage of the creditors whose claims were not secured by privilege and mortgage.

That, if they had intended to acquire said property for a song, they would have desired that the business would be stopped and the property dismantled so as to reduce the number of bidders. That they were of the opinion that the privileged debts which prime their mortgage claim barely amount to $13,000, and that the claim of petitioners was fully secured. They recognized that there was a possibility that the said property, which had cost in the neighborhood of $100,000, would sell for more than the combined claims of the privilege and mortgage creditors, and that it was the duty of the receiver to use every effort to obtain the best price for same. That they were of the opinion that a further delay in advertising said property would work injury to the ordinary creditors, and possibly to the mortgage creditors, but certainly not to the privileged creditors, as there was no doubt that the property will sell for more than enough to pay the privileges in full. That said property should be advertised at as early a date as possible, subject to the right of privileged creditors to ask for a separate appraisement and sale of the property on which they may have privilege. That said property will sell better, if sold for one-third or more cash, and the rest at one and two years' credit for notes of the ———, bearing 7 per cent. interest, secured by vendor's privilege and all customary clauses, as petitioners would be willing that the privileged creditors be paid from the cash payment. They prayed that all the real and personal property of the company in New Orleans and Tangipahoa be sold at public auction, and for such orders and decrees as the nature of the case might require and equity will permit.

The following, among others, were placed on the account as preference claims due by the company, and payment of the same was proposed by the receiver to be paid by it as stated therein:

| | |
|---|---:|
| Geo. A. Villere, balance due on his salary (as president) to September 10, 1906 .................... | $236 84 |
|     *   *   *   *   *   *   * | |
| Germania Savings Bank & Trust Company for receiver, 5 per cent. on $75,400.................... | $3,770 00 |
| Omer Villere, attorney for receiver .......................... | $3,000 00 |

The receiver proposed to make the following distribution among the preference creditors:

**Creamery Package Company.**

   *    *    *    *    *    *    *

| | |
|---|---:|
| W. T. Carey & Bro., $26,000, proceeds of sale of five lots and buildings. .................... | |
| Their privilege claims, $7,822.58, less 93 days' liquidated damages as per contract, $930 .......... | $6,912 58 |
| Of which amount $1,254.38 are claimed by R. P. Le Sassier, W. R. Irby, Omer Villere, and Octave J. Villere on account of their $25,000 mortgage note, which bears 7 per cent. interest from 30th May, 1906. | |
| (1) Balance proceeds of sale of five lots and buildings ............. | 18,087 42 |
| (2) Proceeds two vacant lots. .... | 2,000 00 |
| (3) Proceeds of Hammond real estate ...................... | 3,500 00 |
| (4) Proceeds of sale of agricultural implements and live stock on Hammond farm which was immovable by determination............... | 1,722 50 |
| Total privilege and mortgage claims | 47,039 43 |
| Total disbursements and liabilities. | 73,316 84 |
| Leaving a balance on hand. ...... | 3,299 84 |

Which balance of $3,299.84, or such balance as may be left after trial plus future collections, will be distributed pro rata among the following named ordinary creditors:

W. T. Carey & Bro. ............ $5,464 87

    *      *      *      *      *      *

C. H. Babst, less $1,000 to be deducted for defective work ...... 3,100 00

    *      *      *      *      *      *

Alfred Raymond ............... 60 00

Sundry creditors (Hammond furnishers of milk as per statement C) annexed to answer of receiver filed November 12, 1906 ........ 5,661 60

Sundry creditors as per statement C 1,688 19

On May 1, 1907, the district court rendered the following judgment:

"In this case submitted for adjudication by the receiver, account of date April 19, 1907, for the reasons this day orally assigned by the court, the law and the evidence justifying the judgment. It is ordered, adjudged, and decreed that the account aforesaid be amended as follows:

"First. By striking from the privileged creditors the item George A. Villere, balance due on his salary $286, and by recognizing said Villere as an ordinary creditor for said sum, to be paid only after all other debts of the New Orleans Pure Milk Company have been satisfied.

"Second. By reducing the item German-American Savings Bank & Trust Company, receiver, from $3,770 to $2,613.63.

"Third. By reducing the item J. L. Onorato for sale of real estate from $823.50 to $643.50.

"Fourth. By reducing the item Walsh & Weidner Boiler Company, $1,440.49, so as to allow interest thereon at the rate of 6 per cent. per annum from August 6, 1906, to April 19, 1907.

"Fifth. By recognizing W. T. Carey & Bro. as entitled to the payment of their privileged claim of $7,842.58 in full, without deduction for demurrage or liquidated damages, but subject to R. P. Le Sassier's claim of $1,254.58.

"Sixth. By increasing the item balance of proceeds of sale of five lots and buildings out of which it is proposed to pay W. R. Irby, Omer Villere, and O. J. Villere, mortgage creditors, from $18,087.42 to $18,157.42.

"Seventh. By increasing the item W. T. Carey & Bro. (ordinary creditors) from $5,464.87 to $5,480.12.

"Eighth. By recognizing C. H. Babst as an ordinary creditor for $3,100, without deduction for defective work.

"Ninth. By increasing the item Alfred Raymond from $60 to $1,350.60.

"Tenth. By placing Andry & Bendernagel on said account as ordinary creditors for the sum of $2,061.70.

"Eleventh. By placing Antoine & Armstrong on said account as ordinary creditors for the sum of $158, with 5 per cent. per annum interest from August 9, 1906, to April 19, 1907.

"Twelfth. By striking out the item, 'Sundry Creditors, Hammond furnishers, etc., $5661.30,' as in case of nonsuit.

"Thirteenth. By striking out the item, 'Sundry Creditors, as per statement C, $1,688.19,' as in case of nonsuit.

"It is further ordered, adjudged, and decreed that except as hereinabove mentioned all oppositions to the receiver's account be dismissed, costs to be paid by the receivership, and that as amended said account be approved and homologated, and the funds distributed accordingly."

A motion having been made to homologate the account so far as not opposed, the court on the same day, May 1, 1907, approved and homologated the same so far as not opposed.

Application having been made for a new trial, the same was refused. In so refusing, the court assigned the following reasons for so doing:

"First. The appointment of the receiver herein at the request of a stockholder is maintainable under article 2 of section 1 of Act No. 159, p. 312, of 1898.

"The allegation in the petition that the corporation is hopelessly insolvent and unable to pay its debts, that the present condition of affairs does not justify a continuation under the present management, is, in effect, an allegation that the defendant corporation is being mismanaged. The resolution of the board of directors subsequent to the institution of the receivership proceedings, advertising the corporation's insolvency, does not necessarily bring those proceedings within the purview of article 8 of the said section. Besides, it is specially averred that the corporation is mismanaged. The averment need not be in the exact wording of the statute.

"(2) The power to 'manage and administer for the best interests of all parties' does not confer upon a receiver the power to 'conduct the business of the corporation as a going concern.' Such power, under Act 159 of 1898, should be specifically granted by the court. But where a receiver with power only to manage and administer, shortly after his appointment, applies for an order of sale of all the assets in block, under the honest belief and upon informing the court that it is necessary to sell, and that a sale of a going concern would be to the greater advantage of the creditors, and the order of sale is opposed by some creditors, who seek to annul the receiver's appointment and put an end to the receivership, and the receiver, until an order of sale is secured, with the qualified consent of the opponents, runs the corporation as a going concern at a comparatively small loss,

keeping the court advised of his gestion by statements filed monthly, and it is not apparent to the court that the receiver's conduct was extravagant, unwise, or in defiance of law, the court will so far ratify his acts as not to charge him with the loss sustained in keeping the corporation going. Am. & Eng. Ency. of Law (2d Ed.) vol. 23, p. 1064, Nos. 3, 5, 7; Atwood v. Knowlson, 91 Ill. App. 265.

"(3) In fixing the receiver's commission, however, the court will not take into account the sums of money handled by him during assumed gestion, but will consider only such sums of money proposed for distribution as came into his hands under the power of administration and liquidation conferred upon him. Section 6, Act No. 159, p. 314, of 1898, Rev. St. § 1818.

"(4) The act of 1898 assimilates receivers of corporations to syndics of insolvent individuals, so far from there being any inhibition against the selection of a creditor. Rev. St. § 1810. As syndic, the insolvency statutes favors such a selection. A creditor being eligible as syndic or receiver, there can be no objection to the employing as attorney of the insolvency or receivership an attorney who is himself a creditor.

"(5) Counsel's fees will be allowed though the employment of counsel was not authorized by an order of court when such employment was necessary. There is nothing in the act of 1898 requiring an authorization of the receiver to retain an attorney.

"(6) In fixing the fee of such attorney, both the amount to be distributed and the extent of the services rendered must be considered.

"(7) Cows, live stock, and agricultural implements used in the cultivation (exploitation in French) of a dairy farm are immovables by destination. Civ. Code, art. 468; Fuzier-Herman, art. 524, Nos. 1, 2, 3, 4 and 5; Id. Supplement, art. 524, No. 16; Aubry and Rau, vol. 1, No. 2219; Demolombe, vol. 9, No. 238.

"(8) The auctioneer's charges in a receivership sale are regulated by the tariff provided by section 160 of the Revised Statutes. Succession of Rabasse, 51 La. Ann. 590, 25 South. 326.

"(9) The mortgage creditors are entitled to show by parol the true consideration for and the circumstances under which the mortgage is executed.

"(10) The $25,000 mortgage note was pledged by defendant to the indorser on its demand note for a like amount, and was by them in turn pledged to the German-American Bank to secure the loan made by it to them for account of the defendant company on the aforesaid demand note. Upon paying the demand note the indorsers became subrogated to the bank's rights in the mortgage note, or rather resumed their rights as original pledgees thereof. Rev. Civ. Code, arts. 3291, 3293; Collins v. Creditors, 18 La. Ann. 235; Brander v. Bowmar, 16 La. 370; Pickersgill & Co. v. Brown, 7 La. Ann. 297; Rev. Civ. Code, art. 2161; Millaudon v. Colla, 15 La. 214; Duchamp v. Dantilly, 9 La. Ann. 247; Seixas v. Gonsoulin, 40 La. Ann.

351, 4 South. 453; Woodward v. R. Co., 39 La. Ann. 566, 2 South. 413.

"(11) At the time that the mortgage note was executed, the mortgage creditors were not directors of the defendant corporation, but if they had been, inasmuch as there was no fraud or collusion in securing the mortgage, and its proceeds, together with the price of the additional stock subscribed by them at the time of its execution, were used in paying the contractors and other creditors, their rights would not have been impaired. Standard Cotton Seed Oil Co. v. Excelsior Refining Co., 108 La. 74, 32 South. 221.

"(12) By agreeing to accept stock in payment of their services, the creditors impliedly waived the privilege accorded to them by law, but they did not waive their right to payment, and, the stock not having been tendered, they are entitled to recognition as ordinary creditors in the sums claimed.

"(13) The registry of the contract between Carey & Bro. and the corporation preserved the former's privilege as against third persons to the extent only of the amount contracted for. Extra items thereafter stipulated for constituted new contracts requiring special registry. They were recorded too late. Rev. Civ. Code, arts. 3272, 3274.

"(14) The evidence does not justify the deduction of demurrage under the Carey & Bro. contract.

"(15) No evidence other than that already made by the supervising architects for defective work can be allowed on the Babst claim, but it is not privileged because it was not recorded in time. The duly attested detailed statement of the amount due, dated August 2d, was not recorded until October 1, 1906.

"(16) The salary of officers cannot be paid until all other debts of the corporation have been satisfied. Cotton Seed Oil Company v. Refining Company, 108 La. 78, 32 South. 221.

"(17) Interest when claimed is due on all debts of the corporation up to the date of the filing of the account and tableaux of the distribution. Zeigler v. Creditors, 49 La. Ann. 158, 21 South. 666; Oil Co. v. Refining Co., 108 La. 78, 32 South. 221.

"(18) There is no proof of the items 'Hammond milk furnishers' and 'sundry creditors' as per statement G. The receiver's affidavit to the account is only to the best of his knowledge and belief, and was not offered in evidence.

"I adhere to those conclusions, and decline to reopen this matter at the instance of the Hammond milk furnishers. The account had been filed and published since April 19, 1907. They had ample time to prepare for trial and meet the opposition.

"The new trial prayed for is refused."

Carey & Bro.'s opposition was based upon their claim that they were privileged creditors of the pure milk company for the sum of $13,323.70, based upon two con-

tracts dated January 6 and January 10, 1906, by which they agreed to furnish all the material and complete a building on certain property of the company, described in the contracts, situated in the city of New Orleans, under specifications and plans and addenda specifications, for the price of $28,350, which were recorded in the parish of Orleans on January 6 and February 10, 1906.

They allege that said contracts contemplated additions, changes, and modifications, and a great amount of work was done by them under said contracts, said work amounting to $3,581, as appearing by itemized statements, duly approved by the architect, which were duly recorded in the mortgage office on the ———— day of ————, after being duly sworn to.

That they received their completion or final certificate as provided for in the contracts on September 20, 1906, and same showed a balance of $7,842.58, which final certificate was sworn to and recorded in the mortgage office of Orleans parish on the ———— day of ————.

That they did further work as aforesaid, under the direct order of the president, to an amount of $1,577.44, as appeared by a detailed statement annexed to their petition, which was duly recorded in the parish of Orleans on the ———— day of ————. They averred that they had a lien on the buildings and on the lots upon which the buildings were erected. They alleged that the receiver of the pure milk company had recognized them as a privileged creditor for the sum of $7,842.50, less a deduction of $930 for alleged liquidated damages, and as ordinary creditors for $5,654.87. They opposed the receiver's account, and denied any liability to the milk company for the liquidated damages attempted to be deducted.

They alleged that extra work was given to opponents under the terms and conditions of the contract; that the same exceeded $9,000, increasing the original contract by

122 LA.—24

33⅓ per cent.; that under one of the clauses of the contract it was stipulated that the owner reserved the right to make any modification to the plans and specifications that it might deem necessary; that under this clause in the original contract they did all the work specified in detail in statements dated September 21st annexed to their original petition amounting to $7,284.75.

That they received by way of payments and credits on said extra bill $3,695, leaving due and imposed $3,559.75.

That all said extra work was done under the original contract, was recorded in the mortgage office of the parish of Orleans within one week from its date, to wit, on January 9, 1906, before the work was started; that opponent had a lien and privilege on the building erected by it, and on the lot on which it was erected, and on the proceeds of sale of same then in the hands of the receiver to the full amount of the balance due it under the original contract, $7,842, plus the balance due it for charges under the original contract, to wit, $3,581.71, or a total of $11,452.29.

That the recording of opponent's contract within one week of its date, and before any work was started, gave opponent a lien and privilege on the building and lot, not only for the amount of the contract, but for all extra work done under the provisions of the contract, and that said lien and privilege primes and takes preference over all other creditors. That under the terms of the original contract they did further work for the amount of $377.44 and $1,512.97. Therefore opponents should be put down upon said account as a privileged creditor for the amount of $13,322.70.

They averred that the separate statement referred to by them had also been recorded for greater security on the mortgage book on October 1, 1906.

Opponents further opposed the placing of W. R. Irby, Omer Villere, and Octave J. Vil-

lere on the account as mortgage creditors in the sum of $75,000. They denied that the mortgage note was ever issued, or, if issued, that the mortgage granted with it gave them any priority or preference over opponents' claim; opponents alleging that said parties did not become creditors of the pure milk company until subsequent to the recording of opponents' lien and privilege in the mortgage office.

They specially opposed said item as a privileged claim against the proceeds of the sale of the property therein described, and particularly in the interest of Octave J. Villere as a mortgage creditor, he being the petitioning creditor for a receiver for the defendant company upon the ground that a stockholder cannot secure a privilege within three months of the insolvency of a corporation, superior to contractors, material furnishers, etc., furnishing materials and labor in the erection of the building.

Opponents further opposed the account of George A. Villere, $284.84; A. J. Villere, notary, $100; German-American Savings Bank & Trust Company, $3,770; Omer Villere, attorney for receiver, $3,000—on the ground that said amounts are not due, or, if due, they were excessive.

They averred that there was no prayer asking that the milk company be run as a going concern, and there was no order of court authorizing such extraordinary procedure; but nevertheless the receiver did undertake to run said corporation as a going concern at a loss, and he should not be allowed a credit for such disbursements made by him or for the loss sustained in the operation of the business.

They opposed specially the allowance of $3,770 upon the ground that, if the receiver was authorized to run said corporation as a going concern, his compensation should not exceed $100 a month, as the corporation is charged with all the expenses of manage-

ment, and the receivership was merely supervisory, and under the statute (section 6 of Act 159 of 1898) his compensation is not a fixed percentage, but must be "such reasonable sum as the nature of the case justifies." They prayed that they be placed on the account as privileged creditors for $13,-320.70, and that the various items opposed by them be stricken from the account.

Charles J. Babst opposed the account, claiming to be a privileged creditor of the pure milk company for the sum of $3,100 upon the building erected for the company, upon its property, and upon the lots on which said building was erected, for materials furnished and delivered, as the whole appeared by a detailed statement of account, which it annexed duly approved by the architect, which had been duly sworn to and recorded in the mortgage book of the parish of Orleans.

It opposed any deduction being made from the amount of the same, asserting that such deduction was neither just nor well founded. He opposed each and every disbursement of the receiver, and opposed its taking credit for the amount lost in operating the business. He opposed the same items on the account which Carey & Bro. opposed, and on the same ground.

Octave J. Villere, alleging that he was an ordinary creditor of the milk company for the surplus of interest due on the $25,000 mortgage note, of which he was a one-third owner, opposed the account as to the following items placed thereon:

Creamery Package Manufacturing Company, for $1,500; Creamery Package Manufacturing Company, $2,400; W. T. Carey & Bro., $6,912—on the ground that the same are not due, and that they have no privilege.

Octave J. Villere, Omer Villere, and W. R. Irby, claiming that through an error of calculation they had been placed on the account as preference creditors for $18,087.42, in-

stead of $19,087.42, as they should have been, prayed that the account be amended by correcting the error.

Carey & Bro., Charles J. Babst, Omer Villere, Octave J. Villere, W. R. Irby, the German-American Savings Bank & Trust Company (receiver), and the creditors appearing on the account as sundry creditors, Hammond furnishers of milk, whose claims were by the court disallowed, as of nonsuit, appealed.

The question as to whether the district judge should have acted upon the application of O. J. Villere to have the pure milk company placed under receivership, for the assigned reasons that O. J. Villere was not a creditor of the company at that time, and the application should have been rejected as not having been presented under the conditions and circumstances required by law, is not, we think, properly before us, nor is that for the removal of the German-American Savings Bank & Trust Company as receiver. The property of the company has been sold with the consent of all parties; the receiver has filed a provisional account; and the case is before us on opposition to the account and contest over the distribution of the proceeds of the sale.

Were that question before us—and the fact was that at the time of his application O. J. Villere was simply an indorser who had not as yet paid the note upon which he was an indorser—we are not prepared to say that he would not have been authorized, under article 2042 of the Revised Civil Code, to take all steps conservatory of his interests.

Appellants urge that the receiver is entitled to no commissions, for the reason that no order of court was asked or granted to him to run the business of the company as a going concern; that its management of the receivership was arbitrary in the extreme, and disregarded and ignored in every way the protests of the largest creditors in in-

terest; that the receiver ran the business as a going concern, without specific order of court, at a loss, and in its accounts now attempts to shoulder the loss on the creditors; that the receiver was notified by direct suit and action of the creditors immediately after its appointment of the illegality of that appointment.

The German-American Savings Bank & Trust Company did not institute the proceedings asking for the placing of the company under a receiver, nor seek the appointment as such. It was appointed by the court without solicitation from it. Having accepted the appointment and qualified, it was its right and duty to continue to act as such until relieved from the trust. It was justified in believing that the action of the court was legal and proper unless and until that action was set aside. In making the appointment, the court did not specifically authorize the receiver to carry on the company as a running concern, but it "authorized it to administer and manage its affairs for the best interest of all parties."

The receiver, very shortly after its appointment, recognized the fact that the company could not continue operations under the conditions in which it was placed, and that it was necessary as soon as practicable to sell all of its property, and it accordingly made application for an order of sale. It was of opinion that when that sale was made the company should have retained its customers, so that the purchaser at the sale could at once commence business with an established clientele.

Construing the order appointing it as authorizing it so to do, the receiver continued the operations of the company, though on a reduced scale, until the sale asked for. The business as so carried on resulted in a loss of $704. The court declared in its opinion, subsequently rendered, that its order did not warrant this temporary carrying on

of the operation of the company as had been done; that for such purpose the order should have granted that authority in precise and exact words. So holding, it refused to allow the receiver commissions upon the moneys which went into its hands through such administration, which was dehors the functions of the receiver in this particular case. It refused, however, to accede to the demand of the opposing creditors to forfeit the entire commissions as asked.

We think the judge's action was legal and correct in both respects. The court refused to charge up to the receiver itself the loss of $704 incurred by the receiver in its temporary carrying on of the operations of the company, and made the mass of creditors bear that loss.

We think the court erred in that respect. The administration, so far as that portion of the same is concerned, being dehors the legal functions of the receiver, the loss in question should not be made to be borne by the mass of creditors, but should be made to be borne by the receiver, and that amount deducted from the commissions awarded in the judgment appealed from.

Opponents insist that their attorney who conducted these proceedings is entitled to no fee whatever for his services, as in the proceedings he acted in his own behalf and also in behalf of O. J. Villere and W. R. Irby. It has never been the practice in this state in insolvency proceedings or proceedings under receiverships for the receiver to ask leave of the court to employ an attorney or to give its sanction to the employment of any particular person. The right to obtain the services of counsel and to select the counsel has always been recognized as matters of right. Should there be objections on the part of creditors for legal reasons, those objections should be made at once on the grounds stated. The fact that the attorney selected or others who employ

him may have personal interests in the administration is not good ground for his exclusion by the receiver from employing him as his counsel. That fact, however, affects the amount of his fee. To the extent that his services inured to the benefit of the mass of creditors, they should be paid. We think the attorney in this instance is entitled to a fee of $1,000.

Carey & Bro. claim that:

"They are entitled to be classed in the account as privileged creditors for the full amount of their recorded contract."

In their brief on their behalf, counsel say:

"W. T. Carey & Bro. contracted with the New Orleans Pure Milk Company by notarial act on the 6th of January, 1906, to erect a building in this city according to plans and specifications of Andry & Bendernagel, architects. The contract price was $28,350. The contract provided in its third article that while the work is being done if it should be deemed necessary, advantageous, or convenient to make any modifications in said plans and specifications, or both, the value of such modifications shall be added to or deducted from (as the case may be) the original amount of this contract as herein specified, provided that both contracting parties shall agree beforehand and in writing upon the modifications to be made, and upon the time necessary to make such modifications, and upon the value of the same. The evidence establishes that extra work was done to an amount upon which they have received payments, leaving a balance of $5,489.12 which is covered by privilege in their favor. The building contract was recorded on January 9, 1906, three days after. Omer Villere, Octave J. Villere, and W. R. Irby claim preference over Carey & Bro. and also over Charles Babst by reason of a special mortgage granted by act executed on June 2, 1906, by the pure milk company. The district judge held that Carey & Bro. had a privilege which ranked this mortgage for the balance due them under the contract, but had no privilege for what it termed the amount of extra work performed by them. The court erred in that respect. The building contract was to erect the building for $28,350, but it was distinctly provided that the value of any modifications should be added to the original amount of the contract.

"Carey & Bro. by the immediate registry of their agreement obtained a lien or privilege not only for the $28,350 stipulated as the contract price, but as well for any increased sum due to modifications in the design of the building between the parties. Carey & Bro. recorded their sworn detailed statements for the balance due them under this contract on October 1, 1906. The court erred when it held that the modifica-

tions in this building were contracts which had to be recorded within a given time, otherwise the contractor loses his lien or privilege against a subsequent mortgage. The modifications contemplated in the contract do not form new contracts, but, as expressed in the body of the original contract, the value of such contracts should be added to the original amount of the contract. The court lost sight of the fact that there is a clear distinction between the contract of the parties, the recording of which gives a privilege, and the recordation of a sworn claim; both give privilege. Carey & Bro.'s claim for extras was apparently approved September 21, 1906, and affidavit not recorded until October 1, 1906. The original contract, however, specifically authorized change and modifications, and the contract recorded in the mortgage book on January, 1906, prior to the mortgage of June 2, 1906, preserved a lien and privilege on that building and the lot of ground for all extra work done thereunder, without the necessity of any further recordation of claims for extra work."

Carey & Bro. urge, independently of the question of the registry:

"That the holders of the note cannot compete with them, for the reason that they are not third parties."

They say that:

"Omer Villere and Octave J. Villere were directors of the pure milk company, and became such directors 10 days after the act of mortgage under which they are claiming superior rights, and are not 'third parties in contemplation of law.'

"The fact that they became directors after the date of the mortgage does not affect the case. As directors, the proceeds of the mortgage were under their control."

Carey & Bro. finally take the position that Omer Villere, Octave J. Villere, and W. R. Irby are not mortgage creditors at all. Counsel say:

"The evidence in the record shows that a resolution of May 19th authorized the president to negotiate a loan of $25,000, and to secure the lender by a mortgage on the property of the corporation. On June 19th we see by reference to the minute book that Mr. George A. Villere made a written report, reading:

" 'As per authority conferred on me by the board of directors at its meeting of May 19th, 1906, I have signed a mortgage note for $25,000 secured by two acts of mortgage on all the company's real estate here and in Hammond, and with said mortgage as security and the endorsement of W. R. Irby, Omer Villere, O. J. Villere and W. Voorhies, I have borrowed $25,-000 from the German American National Bank.'

"The testimony of Mr. Omer Villere and Mr.

George Villere is irreconcilably in conflict with the minutes of the corporation and with Mr. George A. Villere's report of his transaction concerning the loan. The evidence of Mr. Omer Villere and Mr. George A. Villere shows that this was not the transaction. Mr. Omer Villere admits that the act of mortgage was made before him as notary public on the 2d of June, 1906, and that he immediately took possession of same, and that he pledged it to the German-American National Bank to secure the indorsement of himself, W. R. Irby, O. J. Villere, and others.

"Mr. Le Breton testifies that he loaned the money upon the indorsement of these gentlemen, and that the mortgage note was not pledged to him for the money.

"The evidence shows that these indorsers did not pay the demand note of the pure milk company until November 8, 1906, more than 38 days after the recording of the detailed statements by Carey & Bro. and Charles J. Babst.

"They have no greater rights than the German-American Bank. The German-American Bank never at any time held this mortgage note in pledge to secure the demand note of the pure milk company, but only to secure the indorsements; in other words, the note was never pledged to the bank by Mr. Villere (George) as president nor by the pure milk company; in other words, there never was any lawful issue or pledge of this note.

"In a contest, therefore, between the holders of such a note and material furnishers who have recorded their liens and privileges prior to the acquisition of this note by said holders, the lien and privilege of the material furnishers must prevail."

On May 19, 1906, at a meeting of the board of directors of the pure milk company, the following resolution was adopted:

"That Mr. George A. Villere, president of the company, be authorized and empowered to negotiate a loan of twenty-five thousand dollars ($25,000) to the company with such person as he should see fit, said loan to be secured by such security on the property of the company as the lender might desire."

On June 19th, George A. Villere, president of the company, made his report to the company as to what he had done under the resolution, as has been stated, and on the same day the board passed the following resolution:

"The president having reported that he had negotiated a loan to this company of twenty-five thousand dollars, and had executed, to secure the same, two acts of mortgage, one on the real estate of this company situated in this city, and the other on the real estate

situated in Tangipahoa parish, said mortgagor having been required by the lender—on motion, duly seconded, the action of the president in executing said two acts of mortgages is hereby confirmed and ratified."

Mr. Le Breton was the officer of the German-American National Bank who made the loan of the $25,000 to the pure milk company. He testified that the president wanted the bank to loan the money secured by a first mortgage on the building; that he declined to lend on those terms, but said the bank would be willing to advance the money provided that the bank was covered by the indorsement or guaranty of the most important stockholders.

"We had in view Mr. Omer Villere, Mr. George A. Villere, Mr. Irby, and Mr. O. J. Villere. After consulting between them, they said they would negotiate it, and asked me to fix the matter. They drew the mortgage for $25,-000, with a mortgage note issued, and made a demand or pledge note, secured by a mortgage of $25,000, on which they indorsed their names on the back, which means according to the act of 1904, that they were responsible for the mortgage and we looked to them for the money; not taking into consideration the mortgage when the company went into the hands of a receiver. Mr. Irby, Mr. Omer Villere, and Mr. Octave Villere paid that note in full, and we turned it over with the collateral note with the mortgage note."

Octave J. Villere testified that, on the same day the receiver was appointed, the bank made a demand on the pure milk company to pay the note.

"They acknowledged they could not pay it, and then demand was made on me to pay it, and I said we would pay it, and the bank held it until we paid it for our account. About the time the mortgage note was given the bank needed money—$40,000—the bank would not lend it, and agreed to lend $25,000 provided we would indorse the notes if we would subscribe—five of us—$15,000 more of stock, which was made up by Mr. Irby, Omer Villere, Mr. Voorhies, and myself (O. J. Villere), of which amount he (O. J. Villere) took $5,000, Mr. Irby $3,500, Omer Villere $3,500, and Mr. Voorhies $3,000. He was not a director when he indorsed that note. I always understood that the money was loaned on account of our indorsement. They insisted on our indorsing the note. He understood from that the bank would not lend the money unless we indorsed the note. He was not deriving any benefit from indorsing the note; he was only creditor of the pure milk company as indorser on the note."

Omer Villere testified that he was the person who negotiated the $25,000 loan; that he tried to get the German-American Bank to take the bonds of the pure milk company secured by mortgage on its property.

"Mr. Le Breton, acting for the bank, said: 'Well, I can arrange it for you. We are not going to loan to the New Orleans Pure Milk Co.; the bank will loan you (the parties who indorsed the note), and we are going to look to you.' We (the indorsers) were the three persons financially responsible. Le Breton said, 'You will have to take a mortgage from the pure milk company, and we will make a note then in order to facilitate matters, and rather, than have you all put out your personal note borrowing the money from the bank, we will make a note of twenty-five thousand dollars signed by the pure milk company; you will indorse it, and you will take the mortgage and give the bank the mortgage in pledge.' The mortgage was ours (Irby's, Octave Villere's, and myself). That mortgage we deposited with the bank. We always considered and recognized that we owed that money to the bank. (Mr. Irby, Mr. Octave Villere, and himself.) When the demand for payment of the note was made, he (Omer Villere) was not in New Orleans; he got there the next day, and took charge of the receivership; he told Mr. Le Breton and Mr. Irby of course he was responsible; he had always been responsible; and he told Mr. Le Breton to hold the note for a few days and he would give him his check. He recognized his obligation as dating from the date of the note on the 2d of June, and he had paid his share of the note. He had taken originally $5,000 of stock in the company, and at the time the note was negotiated he took $3,500 more. Mr. Irby took $3,500. The distinct understanding at the time with Mr. Irby and Mr. Le Breton was that we were to be personally responsible for that money; that the money was being advanced, and that the bank would look to Octave Villere, Irby, and himself (Omer Villere). Mr. George A. Villere and Mr. Voorhies were also made to sign the note, but it was well understood that Irby, Octave J. Villere, and Omer Villere were each responsible for one-third of the note. When it was found that the milk company could not pay, and demand of payment was made, Irby, Octave J. Villere, and himself (Omer Villere) each paid one-third of the note. The pure milk company did not deliver the mortgage note to the bank. He (Omer Villere) took possession of the mortgage as the representative of the mortgagees; he gave it to the bank to secure their indorsement. That mortgage was not given by the pure milk company to the bank; it was given to Irby, Octave J. Villere, and himself (Omer Villere). They were the owners of the mortgage note from the time it was issued, and they

VILLERE v. NEW ORLEANS PURE MILK CO.

gave it to the bank to secure the conditional obligation they had assumed to pay for that note. The mortgage note was delivered to the bank, because it had been agreed with the bank that that money was virtually loaned to them, and they were to take the mortgage from the company and were to give the mortgage note to secure their indorsement. The mortgage note was given under that resolution authorizing Mr. Villere, Octave J. Villere, Mr. Irby, and himself (Omer Villere), who virtually made that loan. The bank agreed to lend that money to Irby, Octave J. Villere and himself (Omer Villere). The latter took this mortgage to guarantee themselves under the resolution of the company, and then they gave the mortgage note to the bank to secure their obligations to the bank —their unconditional obligations, but they owed the money from the beginning. They understood the note was pledged (given) by the company to them, and they gave it to the bank to secure their obligations. Mr. George Villere, as president of the company, issued that note to Irby, Octave J. Villere to retain as security for the money which the bank had agreed to lend them and which they had agreed to lend to the company. The understanding was that the bank should advance the money to Octave J. Villere, Omer Villere, and Irby, and they were to turn it over to the pure milk company with the understanding on the part of the bank that the mortgage note would go to it to secure the indebtedness. The bank, though virtually making a transaction with Octave J. Villere, Omer Villere, and Irby, wanted some security from them.''

The German-American Bank, just before the pure milk company went into the hands of the receiver, was a creditor of that company for $25,000. It was then the holder and owner of a note for that amount executed by that company, which note the bank held under the indorsement thereof of Ratliff Irby, Octave J. Villere, and Omer Villere, and which note was secured as to payment not only by the personal indebtedness of the maker and indorsers, but through the collateral suretyship of a special mortgage executed by the pure milk company on its real property to secure the payment of $25,000, with interest, which mortgage was executed to secure payment of a loan of money to that amount which the company was seeking to obtain. The company obtained that amount of money by a loan made to it, and became obligated for repayment of the same by mortgage. The company not paying the loan at maturity, it was paid by the indorsers. The effect of that payment was to leave the company indebted to them for the amount of the note secured as to payment by a special mortgage dated back to the date of the note.

That result followed whether the indorsers be considered as the direct original lenders of the money loaned to the company out of their own moneys, or whether they obtained the money for the company through their personal responsibility as indorsers, supported by the mortgage executed to secure the repayment of the money borrowed. The proposition that Omer Villere, O. J. Villere, and Ratliff Irby acquired no mortgage rights whatever by reason of the loan made to the pure milk company is not tenable.

The contention of appellants that stockholders of a corporation cannot be granted a mortgage to secure an indebtedness due to them to the prejudice of creditors of the corporation—that stockholders must, so far as debts due to them are concerned, stand in the background until all the creditors not stockholders are paid—is not correct as a general proposition. It may be true under some circumstances, and not so under others. We do not think the facts of this case would justify its application here. It is not claimed that the board of directors were without power or authority to have borrowed from the German-American Bank $25,000, at the time of the execution of the special mortgage referred to, and to have secured to the bank through that mortgage the sum borrowed. Had the bank not been paid by Omer Villere, Octave J. Villere, and R. W. Irby the amount due to it by the pure milk company, we have no reason to suppose that its claims as a creditor would have been attacked; matters (so far as other creditors are concerned) would, under such circumstances, stand precisely as they do now. What seems to draw upon it the censure and attack of the opponents is that the claim is presented, not as one due to the bank, but as one due to these particular stockholders.

We do not think they occupy any worse position than the German-American Bank would occupy were it before the court claiming the benefit resulting from its position as a mortgaged creditor.

In the case of the Cotton Seed Oil Co. v. Refining Co., 108 La. 74, 32 South. 221, this court quoted approvingly an extract from Clark & Marshall, Private Corporations, vol. 2, § 534, to the effect that stockholders may lend money to a corporation and take a mortgage to secure the loan, and in the absence of fraud he has the same right under such a contract as a stranger would. It also quoted as follows from Thompson's Commentaries on the Law of Corporations, vol. 3, p. 2968, § 4068:

"The strict rule that directors cannot enter into contracts with the corporation does not seem practicable. It would operate to disable those who have already embarked their funds in a corporate enterprise, and given to it their personal attention, from assisting it in time of difficulty, except at the risk of doing so without security. A corporation might be in a sorry plight, indeed, if one who had already embarked his funds in it, and who, from the fact of his being one of its managers, is best acquainted with its needs and difficulties, should not be able to make a present advance of money to help it out of those difficulties. That it is necessary for the law to throw around such transactions the strongest safeguards in order to prevent fraud need not be argued. Nor shall it be forgotten that the right of directors of an insolvent corporation to take security for past advances, thereby preferring themselves over other creditors, stands on quite a different footing. We therefore find the prevailing doctrine to be that the director of a corporation may advance money to it, may become its creditor, may take from it a mortgage or other security, and may enforce same like any other creditor, but always subject to severe scrutiny, and under the obligation of acting in the utmost good faith."

The decision copies numerous extracts on the same subject-matter.

The particular parties whose claims to a mortgage are contested did not cause to be executed a special mortgage in favor of themselves to secure a past-due debt; the mortgage was granted to secure the payment of a loan of money which the company was seeking to obtain. The parties now holding the mortgage went to the assistance of the company in obtaining that loan, and simultaneously, or just before doing so, sought still further to assist it by taking additional stock to the amount of $15,000. Carey & Bro., in throwing blame upon the special mortgagees for not holding a privilege for their extra work, ignore the fact that they would and could have secured that privilege had they themselves complied with the law.

We think the judgment of the district court refusing to recognize a privilege as ever existing in favor of Carey & Bro. for the extra work done by them is correct. It is true that there were stipulations made in the building contract in respect to extra work to be done, but the amount or value of the extra work to be done was not fixed and stated therein. We think the issue as to the existence of a privilege for extra work is governed by the decision in First Municipality v. Hall, 2 La. Ann. 549. See, also, Murray v. Sweeney, 48 La. Ann. 763, 19 South. 753.

We think the judgment of the court as to the right of Charles J. Babst to a privilege is correct—proper steps were not taken by him to sustain the privilege claimed.

Andry & Bendernagel not being placed on the provisional account, an opposition was filed in which they claimed to be creditors of the pure milk company for $2,061.70 for services as architects of the building erected by the company, and to have a privilege on the building and lot.

They averred that by their contract they were to be paid for their services, during the life of the company as a going concern, in stock at its market value, as said services were performed; that although such services were rendered the stock was never issued nor delivered; that the company by its acts of maladministration had gone into the hands of a receiver, and was unable to comply with its obligations and make payment in stock, while the company was a going concern.

It was admitted on the trial that the bill for services was correct, and that the situation was such that it could be computed and presented prior to the time it was—September 26, 1906. The president of the company testified that the understanding was that the stock was to be taken at its par value of $100 a share.

On the trial, the court placed them on the account, but without a privilege. It is objected that they are not entitled to a judgment for the reason that the company having virtually failed—they never received the stock—that had such stock been received it would be worthless, as was all the stock of all stockholders who had paid cash for their stock.

Alfred Raymond occupies the same position as Andry & Bendernagel. He was the consulting engineer in the construction of the building of the company, and had consented to take stock in payment of his services. This stock was never issued nor delivered to him. We think the court erred in ordering Alfred Raymond to be placed on the account as an ordinary creditor for $1,350.50, and by ordering Andry & Bendernagel to be placed as ordinary creditors for $2,060.70.

We think that neither Raymond nor Andry & Bendernagel have claims against the pure milk company as creditors. Whatever legal rights they may have in the premises are such as will belong to them as holders of the stock which they consented to take, and which the company contracted and consented to issue to them for and in consideration of their services.

It is not claimed that they made any demand for stock. Had the placing of the company in the hands of a receiver been delayed for a few days and the stock been issued to them, it would to-day be worthless in their hands; they occupy no better position now than they would have occupied had this been the case. The placing of the company in the hands of a receiver did not have as its result the placing of those parties before the court as creditors. Webre v. Beltran, 47 La. Ann. 201, 16 South. 860.

We see no reason for disturbing the action of the court in rendering a judgment of nonsuit upon the item of the account headed "Sundry Creditors (Hammond furnishers of milk)."

The Walsh & Weidner Boiler Company, which obtained a judgment in its favor, and the partnership of Antoine & Armstrong, which obtained a judgment in its favor of the district court alleging that the court did not accord them the full relief to which they were entitled, have asked in this court that the judgments in their favor be amended, but they have not appealed. They should have done so. We can afford them no relief.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from, in so far as it made the mass of creditors bear the loss of $704, incurred by the receiver in carrying on the operations of the New Orleans Pure Milk Company from the time it went into the hands of the receiver up to the date of the sale of the real estate belonging to the company, be, and the same is, annulled, avoided, and reversed; and it is hereby ordered, adjudged, and decreed that said loss be borne by the receiver, and that said amount be deducted from the amount of the commissions awarded to the receiver by the judgment appealed from. It is further ordered, adjudged, and decreed that the sum of $3,000 awarded to Omer Villere for his fee as attorney herein be, and the same is hereby, reduced to $1,000. It is further ordered, adjudged, and decreed that the decree recognizing Alfred Raymond as an ordinary creditor of the New Orleans Pure Milk Company, Limited, for the sum of $1,350.50, and ordering him to be placed on the receiver's account for said amount as such, be, and the same is, set aside, annulled, avoided, and reversed.

It is further ordered, adjudged, and decreed that the decree recognizing Andry & Bendernagel as ordinary creditors of the New Orleans Pure Milk Company, Limited, for the sum of $2,060.70, and ordering them placed on the receiver's account as such for said amount, be set aside, annulled, avoided, and reversed. It is further ordered, adjudged, and decreed that the application of the Walsh & Weidner Boiler Company and the partnership of Antoine & Armstrong for relief under their prayer for an amendment of judgment are not properly before the court for consideration. It is further ordered, adjudged, and decreed that the judgment appealed from, as so altered and amended, be, and the same is hereby, affirmed.